**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**THIRD DIVISION**

MINNESOTA TWINS PARTNERSHIP
(a/k/a THE MINNESOTA TWINS),
a Minnesota Partnership, and
MTI PARTNERSHIP, LLP
(f/k/a MTI PARTNERSHIP),
a Minnesota Limited Partnership,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

Civil No. 00-356 ADM/AJB

**REPORT AND RECOMMENDATION**

Charles R. Shreffler, SHREFFLER LAW FIRM, P.A.; James L. Huston and Zhu Lee, FOLEY & LARDNER (OF COUNSEL), on behalf of Plaintiffs.

Rachel D. Cramer and Charles P. Hurley, TAX DIVISION, U.S. DEP'T OF JUSTICE, on behalf of Defendant.

## I. INTRODUCTION

On February 16, 2000, Plaintiffs (the "Twins") filed a three-count complaint against Defendant (the "Government"). Count I contends that the interest portion of certain settlement distributions was not "wages" for purposes of the Internal Revenue Code. Count I seeks a refund of taxes, which were paid pursuant to the Federal Insurance Contributions Act ("FICA"), 26 U.S.C. § 3101, *et seq.*, and a refund of taxes, which were paid pursuant to the Federal Unemployment Tax Act ("FUTA"), 26 U.S.C. § 3301, *et seq.* Count II also seeks a refund of FICA and FUTA taxes, contending that the damages portion of the aforementioned distributions was not "wages." Count III contends that, even if Counts I and II fail, the Twins are still entitled

FILED APR 30 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD________
DEPUTY CLERK________

to a refund because the distributions, for tax purposes, should have been assigned to the years in which the damages were incurred and not to the years in which the distributions were paid.

The matter is presently before the Court on the Twins' Motion for Summary Judgment and on the Government's Motion for Partial Summary Judgment. The Government concedes the issue in Count I, but contests the refund sought in Count II. The pending motions do not address Count III.[1] The matter is properly before the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. For reasons discussed below, it is recommended that the Twins' motion be granted in part and denied in part, and that the Government's motion be granted in part and denied in part.

## II. BACKGROUND

The Major League Baseball Clubs ("Clubs"), including the Twins, entered into a collective bargaining agreement (the "Basic Agreement") with the Major League Baseball Players' Association ("MLPA"), which became effective January 1, 1980. The Basic Agreement establishes the common terms and conditions of players' employment, including terms and conditions of free agency.[2] Free agents—players not contractually bound to a Club for the upcoming season—are free to entertain employment offers from other Clubs.[3] Article XVIII(H)

---

[1] The issues in Count III have presumably been settled by U.S. v. Cleveland Indians Baseball Co., No. 00-203, 2001 WL 376554, __ S.Ct. __ (April 17, 2001). The parties have agreed, with the approval of the Court, not to brief the issues in Count III.

[2] In addition to the Basic Agreement, the employment of each player is controlled by a Uniform Player Contract ("UPC"). Unlike the Basic Agreement, the parties to a UPC are an individual player and an individual Club. The standard form of the UPC was negotiated, collectively, between the MLPA and the Clubs. Although each UPC begins as a standard form, players are free to negotiate terms such as salaries, bonuses, deferred compensation, no-trade clauses, etc.

[3] Free agency can arise in two ways. First, a player who has at least six years in the major leagues may choose to become a free agent. Next, a player who is not otherwise eligible for free agency becomes a free agent when his Club does not offer him a new contract.

of the Basic Agreement prohibits concerted action by the Clubs with respect to free-agent bidding:

> The utilization or non-utilization of rights under this Article XVIII [relating to free agency] is an individual matter to be determined solely by each Player and each Club, for his or her own benefit. Players shall not act in concert with other Players and Clubs shall not act in concert with other Clubs.

In 1986, 1987 and 1988, the MLPA filed three separate arbitration grievances,[4] contending that, following the 1985, 1986, and 1987 seasons, the Clubs engaged in concerted action with respect to free-agent bidding. The grievances alleged that the violations resulted in damages to the players in the years 1986 to at least 1990. In all three grievances, the arbitration panel concluded that the Clubs violated Article XVIII(H) of the Basic Agreement. Specifically, the panel found that, following the 1985 and 1986 seasons, the Clubs agreed not to bid for free agents whose former Club[5] remained interested in retaining the player, and that following the 1987 season, the Clubs maintained a secret "Information Bank" through which the Clubs shared information about offers being made to free agents. The panel determined that, but for the collusion, players' collective salaries would have been an additional $10,528,086.71 for the 1986 season, $38,000,000 for the 1987 season, and $65,500,000 for the 1988 season. The arbitration panel did not attempt to determine lost salary for any individual player.

With liability established, but before the arbitration panel rendered its final decision as to post-1988 lost salary claims, and before the arbitration panel decided if the players could recover "non-salary" damages, the Clubs conducted a risk analysis. The analysis began with the amount that the arbitrators had already determined as the shortfall for the years 1986-1988. The analysis

---

[4] The Basic Agreement requires that disputes be resolved through binding arbitration.

[5] "Former Club" refers to the Club for which a free agent played during the season just prior to becoming a free agent.

then detailed the payments expected to be made as a result of continuing litigation. Based on the analysis, it was predicted that the Clubs were at risk of incurring liability of over $300 million. The results of the risk analysis, in part, prompted the Clubs to enter into a settlement agreement.

Under the settlement agreement, which was executed in December of 1990, the Clubs agreed to pay $280 million in damages and pre-settlement interest. The settlement established joint and several liability among the 26 then-existing Clubs. The settlement agreement settled all claims set forth in the grievances, including salary and "non-salary" claims. However, the settlement agreement did not allocate any amounts to specific claims or to specific years. Instead, the agreement provided that the MLPA, subject to the approval of the arbitration panel, would determine how the settlement funds would be divided among the players.

Pursuant to the settlement agreement, the distribution of the settlement funds went as follows. The MLPA submitted, to the arbitration panel for approval, a proposed framework for evaluating the claims of the individual players ("Framework"). The Framework, which was substantially approved by the arbitration panel, set forth the principles and procedures to guide the MLPA in evaluating each player's claim.

Pursuant to the Framework, the MLPA proposed the first partial distribution plan, which was substantially approved by the arbitrators in February of 1994. Awards made under this plan were designated as lost salary for the 1986 and 1987 baseball seasons. The MLPA proposed another partial distribution plan, which was approved by the arbitrators in January of 1995. Awards made under this plan were designated as "non-salary" losses for the 1986 and 1987 baseball seasons. The MLPA proposed a third partial distribution plan, which was approved by the arbitrators in May of 1997. Awards made under this plan were designated as lost salary for the 1988 baseball season.

The mechanics of the distributions were as follows. Each of the 26 then-existing Clubs paid 1/26th of the total settlement payment. The Clubs established a custodial account for the purpose of holding the settlement funds until all distributions had been made.[6] The custodian of the account established 26 subaccounts. The funds in each Club's subaccount remained the property of that Club.[7] Upon receiving an approved distribution plan the fund custodian prepared checks accordingly. The custodian used 26 different checkbooks, all bearing the same account number. Each check form identified the drawer as "Custodian of the Collusion Settlement Account as Agent for [name of one Club]." When paying an award recipient, the fund custodian used a check bearing the name of the Club for which the recipient played during the year for which the distribution was paid. If an award recipient did not play for any Club in the year for which a distribution was paid, their distribution would be paid with a check bearing the name of the Club that had last employed that recipient. Upon distribution, each Club's subaccount was debited proportionally.

Out of the 1994 distributions, five award recipients, who played with the Twins in 1986, received individual settlement payments totaling $227,841 in damages and $82,036.95 in pre-settlement interest. In addition, twelve award recipients, who played with the Twins in 1987, received individual settlement payments totaling $1,177,747 in damages and $330,513.81 in pre-settlement interest. In connection with the aforementioned 1994 distributions, the Twins paid $63,597.81 as the employer's share of FICA taxes and $700.14 in FUTA taxes. The current action seeks a refund of those taxes.

---

[6] Pursuant to the settlement agreement, after the last distribution, the MLPA was to take custody and control of the remaining funds, assuming there were any.

[7] The Clubs were responsible for paying taxes on any income earned by the account, in proportion to the balance of their subaccount. The funds in each Club's subaccount were subject to the liens and claims of that Club's creditors, but not the creditors of another Club.

Out of the 1995 distributions, five award recipients, who played with the Twins in 1987 (or who last played with the Twins prior to 1987), received individual settlement payments totaling $440,686 in damages and $123,670.59 in pre-settlement interest.[8] In connection with the aforementioned 1995 distributions, the Twins paid $21,154.35 as the employer's share of FICA taxes[9] and $280 in FUTA taxes. The current action seeks a refund of those taxes.

Out of the 1997 distributions, nineteen award recipients, who played with the Twins in 1988, received individual settlement payments totaling $2,849,007 in damages and $570,564.39 in pre-settlement interest. In connection with the aforementioned 1997 distributions, the Twins paid $107,626.24 as the employer's share of FICA taxes[10] and $952 in FUTA taxes. The current action seeks a refund of those taxes.

## III. ANALYSIS

### A. Legal Standard

"Summary judgment is appropriate where there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law." Rolscreen Co. v. Pella Products of St. Louis, Inc., 64 F.3d 1202, 1208 (8th Cir. 1995) (citations omitted). Here, the parties stipulate that there is no genuine issue of material fact.

---

[8] In its statement of facts, the Government contends that the interest portion of the 1995 distributions amounted to $123,670.50. For this assertion, the Government cites the Complaint. However, the Complaint alleges $123,670.59. The Court presumes that the 9¢ discrepancy is a mere typographical error.

[9] The parties' briefs do not agree as to the amount of FICA taxes paid in association with the 1995 distributions. In their response brief, the Twins point out that this discrepancy was a result of the Government relying upon an error in the Complaint. In any event, the Government's response brief does not dispute any of the facts recited in the Twins' initial brief and therefore, the Court accepts the Twins' dollar amount.

[10] The parties' briefs do not agree as to the amount of FICA taxes paid in association with the 1997 distributions. In their response brief, the Twins point out that this discrepancy was a result of the Government relying upon an error in the Complaint. In any event, the Government's response brief does not dispute any of the facts recited in the Twins' initial brief and therefore, the Court accepts the Twins' dollar amount.

**B. FICA/FUTA**

Under FICA and FUTA, an employer must pay an excise tax, in connection with maintaining employees, measured as a percentage of wages paid. 26 U.S.C. §§ 3111(a), 3301. "The term 'wages' means all remuneration for employment," unless specifically excepted. 26 U.S.C. §§ 3121(a), 3306(b). Under FICA, "the term 'employment' means any service, of whatever nature, performed . . . by an employee for the person employing him." 26 U.S.C. § 3121(b). Under FUTA, the term "employment" has the same definition, with qualifications not important here. 26 U.S.C. § 3306(c).

**C. Count I**

In Count I, the Twins contend that the pre-settlement interest portion of the distributions was not "wages" for purposes of FICA or FUTA. As noted above, in connection with the 1994 distributions, the Twins paid $63,597.81 as the employer's share of FICA taxes and $700.14 in FUTA taxes. Of those taxes paid, $7,592.90 is attributable to pre-settlement interest.[11] Count I, therefore, seeks $7,592.90 plus interest. With respect to Count I, the Government does not dispute (1) liability, (2) the amount of refund sought, nor (3) the imposition of interest. Therefore, the Twins' Motion for Summary Judgment should be granted with respect to Count I.

**D. Count II**

In Count II, the Twins contend that the damages portion of the 1994, 1995 and 1997 distributions (hereinafter "distributions") was not "wages" for purposes of FICA or FUTA.

[11] The Clubs did not pay FICA and FUTA taxes on the pre-settlement interest portion of the 1995 and 1997 distributions because, in a private letter ruling dated October of 1995, the IRS ruled that the pre-settlement interest portion of the distributions was not "wages."

Count II seeks $178,023.66[12] plus interest as a refund for FICA and FUTA taxes paid on those distributions.

In support of its motion, the Twins first argue that 25/26ths of each distribution was from a Club with which the recipient never had an employment relationship. It follows, the argument goes, that at least 25/26ths of each distribution was not "wages." However, it is the nature of the distributions that is important. If the distributions should truly be viewed as "wages," the Court will look past the distribution structure and assign the distributions accordingly.[13] Allowing the distribution structure to dictate the true nature of the distributions would invite employers to concoct payment schemes to avoid paying FICA and/or FUTA taxes. The fundamental question is whether the distributions were remuneration for "work actually done [or for] the entire employer-employee relationship for which compensation is paid to the employee by the employer." Social Security Board v. Nierotko, 327 U.S. 358, 365-66, 66 S.Ct. 637, 641, 90 L.Ed. 718 (1946). If this question is answered in the affirmative, the Court will not be constrained by the distribution scheme in concluding that the distributions were "wages."

In attempting to portray the true nature of the distributions, the Twins point out that the underlying grievances asserted a breach of the collective bargaining agreement and not a breach of any individual player's employment contract. The Twins argue, therefore, that the distributions are merely contract damages as opposed to back pay. The Court agrees that the distributions flowed from a breach of the Basic Agreement, but does not find this fact to be

[12]It is not clear how the Twins came to this amount. The Court's calculation produces $186,717.64. Because the Court recommends that Count II should fail, the apparent discrepancy is of no consequence.

[13]The 1994, 1995 and 1997 distributions amounted to $5,802,066.74. If these distributions are of such a nature that they should be deemed "wages," the Court can look past the distribution structure and say that the entire $5,802,066.74 was paid by the Twins. This might seem odd in the short-run because the Twins, *in fact*, did not part with $5,802,066.74 in paying the 1994, 1995 and 1997 distributions. However, the numbers come together in the long-run, as the Twins paid enough in total to cover the $5,802,066.74.

dispositive. The Court's decision does not necessarily turn on whether the Clubs violated the Basic Agreement or an individual employment contract. Consider a hypothetical. If the League (which is the Clubs, collectively) suspended a player without just cause, the Basic Agreement would be violated and the player would be entitled to salary lost as a result of the improper suspension. Ex. 1 at pg. 30-1. The payment of lost salary in that situation would clearly constitute "wages." The answer would not change just because all the Clubs contributed 1/26th. There is no significant difference between the Court's hypothetical and this case. The Twins have offered many cases, several Revenue Rulings, and an abundance of argument, but none has persuaded the Court that the distributions in this case should not be viewed simply as back pay, which is undoubtedly "wages" for purposes of FICA and FUTA. Nierotko, 327 U.S. at 364-66, 66 S.Ct. at 640-41.

The Twins make an alternative argument under Count II. The Twins contend that, at least, the 1995 distributions are not "wages" because they do not represent lost salary, but instead represent compensation for loss of mobility. At this point, it is appropriate to direct the Twins' attention to San Francisco Baseball Associates L.P. v. U.S., 88 F.Supp.2d 1087 (N.D. Cal. 2000), which arose out the same facts as this case. In San Francisco, the court rejected the exact argument which the Twins now present as an alternative argument under Count II. Id. at 1092-94. The Court agrees with the San Francisco decision, and sees no purpose in expanding on the reasoning therein.

## IV. CONCLUSION AND RECOMMENDATION

With respect to Count I, the Government does not dispute (1) liability, (2) the amount of refund sought, nor (3) the imposition of interest. With respect to Count II, the Court concludes that the damages portion of the 1994, 1995 and 1997 distributions constitute "wages" for purposes of FICA and FUTA. For the foregoing reasons, IT IS HEREBY RECOMMENDED that,

1. Plaintiffs' Motion be granted in part and denied in part;

2. Defendant's Motion be granted in part and denied in part; and

3. Defendant be ordered to reimburse Plaintiffs, with interest, the FICA and FUTA taxes paid in connection with the pre-settlement interest portion of the 1994 distributions (i.e., $7,592.90 plus interest).

Dated: 4/30/01

Arthur J. Boylan
United States Magistrate Judge

## NOTICE

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of the Court and serving all parties, within ten days after being served with a copy thereof, written objections which specifically identify the portions of the proposed findings, recommendations, or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

AJB